```
         IN THE UNITED STATES DISTRICT COURT
     FOR THE EASTERN DISTRICT OF NORTH CAROLINA
                   WESTERN DIVISION
                  NO. 5:12-CV-69-H-KS
```

ROSE LORENZO, on behalf of )
herself and all others )
similarly situated, )
)
    Plaintiffs, )
)
  v. )      **ORDER**
)
PRIME COMMUNICATIONS, L.P., a )
Texas General Partnership, )
)
    Defendant.

This matter is before the court on the parties' cross motions for summary judgment [DE #305 & #312] as to the Rule 23 Class claims remaining in this action. The motions have been fully briefed, and the time for further filings has expired. These matters are, therefore, ripe for adjudication.

### **BACKGROUND**

Plaintiff Rose Lorenzo ("Lorenzo") filed this action against her former employer, Prime Communications, L.P. ("Prime"), alleging violations of the Fair Labor Standards Act, 29 U.S.C. §§ 201 et seq., ("FLSA") and the North Carolina Wage and Hour Act, N.C. Gen. Stat. §§ 95-25.1 et seq., ("NCWHA"). The court previously entered orders conditionally certifying Lorenzo's FLSA claim as a collective action pursuant to 29 U.S.C. § 216(b) and certifying a Rule 23 class as to her NCWHA claims. The parties have resolved

all FLSA claims;[1] thus only the Rule 23 NCWHA claims remain pending before the court. As to these claims, the parties have filed cross-motions for summary judgment.

## DISCUSSION

### I. Standard of Review

Summary judgment is appropriate when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the moving party has met its burden, the non-moving party may not rest on the allegations or denials in its pleading, Anderson, 477 U.S. at 248, but "must come forward with 'specific facts showing that there is a genuine issue for trial,'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). Summary judgment is not a vehicle for the court to resolve disputed factual issues. Faircloth v. United States, 837 F. Supp. 123, 125 (E.D.N.C. 1993). Instead, a trial court reviewing a claim at the summary

---

[1] Over 120 individuals opted into the FLSA collective action. Sixty-eight plaintiffs accepted offers of judgment, four plaintiffs withdrew their consents, and the remaining FLSA claims were resolved by settlement following a court-hosted mediated settlement conference. (See Order Approving FLSA Settlement [DE #474].)

2

judgment stage should determine whether a genuine issue exists for trial. Anderson, 477 U.S. at 249.

In determining whether there exists a disputed issue of material fact, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson, 477 U.S. at 255. Only disputes between the parties over facts that might affect the outcome of the case properly preclude the entry of summary judgment. Id. at 247-48. Accordingly, the court must examine "both the materiality and the genuineness of the alleged fact issues" in ruling on Defendant's motion. Faircloth, 837 F. Supp. at 125. "When considering cross-motions for summary judgment, a court evaluates each motion separately on its own merits using the standard set forth above." Garcia v. Frog Island Seafood, Inc., 644 F. Supp. 2d 696, 704 (E.D.N.C. 2009).

II. **Prime's Commission/Bonus Policies**

As an authorized retailer for AT&T, Prime sells wireless products and services on behalf of AT&T and receives commissions from AT&T for those sales. The Rule 23 class members are individuals employed by Prime as Solution Specialists (hourly, commissioned sales personnel) or Store Managers at its twenty-five North Carolina retail locations.

Until 2013, Prime's Sales Compensation/Bonus Plans provided for payment of commissions to Solution Specialists based upon their individual monthly sales "calculated from Gross Profit (GP) with

3

factored discounts and features, net of costs, chargeback[s], and deductions." (Solution Specialist Sales Comp. Plan [DE #44-3].) Store Managers were promised bonuses on their respective store's aggregate monthly sales calculated from "Gross Profit . . . net of costs and chargeback[s] with factored discounts and features." (Store Manager Sales Comp./Bonus Plan [DE #44-4].)

Prime records its sales in two separate computer software systems. One is an AT&T-hosted, point-of-sale system referred to as "POS." The other system, "RQ4," belongs to Prime and is used as Prime's inventory management system. To initiate a sale, an employee enters the customer's information into POS to generate a credit report. Upon credit approval, a sales report is generated listing the handset, rate plan, and any data plan or features selected by the customer. The transaction is finalized in POS by activating a Subscriber Agreement with AT&T. The employee then exits the POS system and records the transaction in RQ4. To record the sale in RQ4, the employee enters the customer information, scans the handset and any accessories to release them from Prime's inventory, and inputs the rate plan, data plan, and feature choices. The employee then generates a customer invoice for the handset and accessories. (Pls.' Stmt. Material Facts [DE #313] ¶¶ 10-18.)

Prime paid commissions to its employees on a monthly basis, approximately thirty to sixty days in arrears. Commissions from

4

the sale of handsets and accessories were determined using the data contained in RQ4. Commissions from the activation of Subscriber Agreements were based upon information provided by AT&T. Prime reconciled the information provided by AT&T with the information contained in RQ4 in order to identify transactions for which it had not been paid by AT&T. If a transaction was recorded in RQ4 but there was no corresponding payment to Prime from AT&T, the transaction was listed as an "unpaid transaction" and reviewed. If Prime's review did not lead to a payment correction by AT&T, the employee received no commission from the recorded sale. (Pls.' Stmt. Material Facts ¶¶ 19-26; Def.'s Stmt. Material Facts [DE #307] ¶¶ 18-27.)

Additionally, adjustments to commissions were made where customers canceled or changed their service within 180 days. In that circumstance, AT&T voided the transaction; and any subsidies for the cost of the phone or commissions paid to Prime were "charged back" by AT&T. Employee commissions were similarly adjusted to reflect these chargebacks. (Pls.' Stmt. Material Facts ¶¶ 27-29; Def.'s Stmt. Material Facts ¶¶ 19-20.)

Store Managers received bonuses based upon the gross profit of their respective stores. (Lorenzo Aff. [DE #44-2]; Store Manager Sales Comp./Bonus Plan; Dunlap Dep. [DE #288-3] at 39.) These bonuses were subject to chargebacks, as well as deductions for

inventory and cash shortages. (Store Manager Sales Comp./Bonus Plan; Pls.' Stmt. Material Fact ¶¶ 30-33.)

Individuals hired during the period of 2010 to November 2013 signed a written acknowledgment of certain company policies, including the following:

### Acknowledgement of Wage Deduction

The post paid and prepaid sales are subject to a 180-day deactivation deduction as are feature commissions, both of which may be deducted from my pay when the Company is informed of same and in the event of separation from the [C]ompany, the Company is authorized to withhold my final commission check for a period of 180 days in lieu of future de-activation chargebacks.

### Acknowledgement of Chargeback

Prime Communications is paid directly by carriers and third party vendors for products and services sold on their behalf. The agreement between these carriers and vendors is dependent upon transactions being conducted accordingly by the specified carrier or vendor policies. As such, when an employee does not follow policy, the carrier or vendor charges Prime Communications back against commissions. Because chargebacks are caused when an employee performs an activity incorrectly, Prime Communications charges back against earned commissions.

(Acknowledgements 2011 [DE #313-6 at 25; DE #80-2; DE #80-3].)

Prime's 2010 Employee Handbook further provided the following information regarding payment of commissions:

Commissions are paid on a separate payroll from regular earnings. The Commissions Payroll Schedule is posted on the Employee Portal for your review. New employees will receive their first commission check after the first 60 days of employment. All Commissions are subject to Carrier and Company charge backs. Please

6

refer to the Chargeback Policy found on ADP self-serve
website under the Payday tab.

>
> Due to the fact that commissions are subject to
> carrier charge backs, **ALL** unpaid commissions, upon
> termination are paid 180 days after termination.

(2010 Employee Handbook [DE #53-3] at 10.)

In 2013,[2] Prime changed its compensation policies and procedures to include an "opportunity plan" in lieu of its previous commission/bonus structure. Under the new pay structure, employees no longer receive commissions or bonuses based upon gross profit, but rather upon the number of cell phone activations. Prime also revised its Employee Handbook, notifying its employees that "[a]ll transactions are subject to Customer Refunds for the first 180 days" and that commissions are not earned "until 180 days after customer activation." (2013 Employee Handbook [DE #313-12 at 5-6].) The 2013 Employee Handbook further provides:

> Prime Communications does not wish its employees to wait
> 180 days to be paid commissions, and will therefore
> advance payment on these commissions; however, all
> commissions paid to employees are subject to reversal if
> the Customer returns their device or cancels their
> service within the 180-day period.

---

[2] Prime asserts that the change in its compensation plan became effective for Solution Specialists on May 31, 2013, and for Store Managers on October 1, 2013. While Plaintiffs dispute Prime's stated dates, there is no question that all employees were provided written notice of the change in November 2013. For purposes of the motions presently before the court, the court finds that the change to Prime's compensation policies became effective sometime in November 2013.

(Id.) Under the new plan, managers "are eligible for a Bonus based upon their stores [sic] performance on the sales of products and services," provided they are full-time employees in good standing and "[m]eet certain minimum sales and/or performance goals in the month for which bonuses are calculated." (Id.) The 2013 Employee Handbook further informs all employees that

> Prime Communications is paid directly by carriers and third party vendors for products and services sold on their behalf. The agreement between these carriers and vendors is dependent upon transactions being conducted accordingly by the specified carrier, Prime Communications or vendor policies. When an employee does not follow policy or procedures, it impacts Prime Communications' commissions from AT&T and profitability. As a result of this impact, the employee who performed the activity incorrectly, would have their commission/bonus amount adjusted in accordance with the financial loss. Examples of these issues are: inventory shrinkage, failure to secure a customer's deposits, cash/deposit shortage, failure to process returned and trade-in devices accurately, incorrectly entering transactions in the point-of-sale system, and other similar errors. These financial loss amounts, adjusted on the employee's commission/bonus, can be either dollar-for-dollar or percentage based.

(Id.)

### III. Analysis

At issue here are the NCWHA claims raised by the Rule 23 class. Plaintiffs assert that prior to the November 2013 change in Prime's pay structure, commissions and bonuses were earned at the point of sale. Thus, they contend, Prime's policy and practice of deducting or charging back for transactions not reimbursed by AT&T violated North Carolina's payday statute, N.C. Gen. Stat. § 95-

8

25.6, and wage deduction statutes, N.C. Gen. Stat. §§ 95-25.8 and 95-25.13. Plaintiffs further argue that Prime violated the NCWHA by excluding certain revenue in its gross profit calculation upon which commissions and bonuses were paid.

A.  Wage Deduction/Chargeback Policies

The NCWHA requires employers to notify employees, in advance, "of the wages and benefits which [they] will earn and the conditions which must be met to earn them, and to pay those wages and benefits due" when earned. Narron v. Hardee's Food Sys., 75 N.C. App. 579, 583, 331 S.E.2d 205, 208 (1985). "Wages" includes promised commissions and bonuses. N.C. Gen. Stat. § 95-25.6. Once earned, wages may be withheld or diverted by the employer only in the following circumstances: (1) where "[t]he employer is required or empowered to do so by State or federal law"; (2) where the employer has advance, written authorization from the employee, "signed on or before the payday(s) for the pay period(s) from which the deduction is to be made"; or (3) where criminal proceedings have been initiated against the employee "for a charge incident to a cash shortage, inventory shortage, or damage to an employer's property." N.C. Gen. Stat. § 95-25.8.

Wages and benefits not yet earned are, however, subject to loss or forfeiture if the employee has advance notice of the conditions upon which loss or forfeiture may be had. Narron, 75 N.C. App. at 583, 331 S.E.2d at 208. Furthermore, overpayments of

9

wages due to miscalculation or bona fide error and advances of wages are prepayments, which may be recouped by the employer without authorization of the employee or advance written notice. N.C. Gen. Stat. § 95-25.8(d).

Plaintiffs contend they are entitled to judgment as a matter of law on their wage deduction claims because Prime's Sales Compensation Plan, Chargeback Policy, and Wage Deduction Policy expressly establish that commissions were earned at the point of sale. (Pls.' Mem. Supp. Mot. Summ. J. [DE #315] at 5-7.) Plaintiffs argue that Prime's practice of reducing these earned commissions by company and carrier chargebacks without notice and authorization violated the NCWHA. (Id. at 9-12.)

Prime, on the other hand, contends that its commission/bonus plan does not violate the NCWHA. Prime argues that its plan is a "front-loaded commission arrangement" where "employees are sometimes advanced more upfront commission than they are ultimately due," for example, where a customer subsequently returns an item sold by the employee. (Def.'s Mem. Opp. Pls.' Mot. Summ. J. [DE #354] at 3.) Prime contends that, in these circumstances, it simply reconciles the overpayment against future commissions. (Id.)

Whether Prime intended that commissions be earned at the time of sale is key to the parties' dispute over the chargeback policy. As both parties acknowledge, North Carolina law does not specify

10

the means or manner in which commissions are earned. That is a matter of contract between the employer and its employees. Where, as here, an employer promises to provide wages or other employment benefits and the employee accepts the offer by entering or continuing employment, a unilateral contract is formed. Cheek v. City of Greensboro, 152 F. Supp. 3d 473, 477 (M.D.N.C. 2015), aff'd sub nom. Davis v. City of Greensboro, 667 F. App'x 411 (4th Cir. 2016); White v. Hugh Chatham Mem'l Hosp., Inc., 97 N.C. App. 130, 131-32, 387 S.E.2d 80, 81 (1990). The terms of the contract are those established by the employer's unilateral offer. See Narron, 75 N.C. App. at 582, 331 S.E.2d at 207; Small v. Springs Indus., 292 S.C. 481, 484, 357 S.E.2d 452, 454 (1987) (interpreting South Carolina law).

Prime promised to pay its employees commissions and bonuses based upon gross profit of sales, net of costs, chargebacks, and deductions. (Solution Specialist Sales Comp. Plan ("Commission is calculated from Gross Profit (GP) with factored discounts and features, net of costs, chargeback[s], and deductions."); Store Manager Sales Comp./Bonus Plan ("Gross Profit [for Bonuses] is calculated net of costs and chargeback[s] with factored discounts and features"; "Bonus deductions include, but are not limited to: unsupported inventory shrinkages and missing deposits.").) That Prime specified commissions and bonuses would be calculated "net of" chargebacks and deductions suggests that commissions are not

11

earned until the appropriate chargebacks and deductions are determined. Moreover, Prime's Sales Compensation Plan and Wage Deduction Policy both reference a 180-day deactivation chargeback. (Solution Specialist Sales Comp. Plan; Acknowledgements 2011.) This evidence suggests that commissions are not earned at the point of sale, but rather at some later date.

As Plaintiffs point out, though, Prime's policies also support a contrary finding. Prime's Chargeback Policy, included in the acknowledgement form signed by employees, expressly states that "Prime . . . charges back against <u>earned</u> commissions." (Acknowledgements 2011 (emphasis added).) Additionally, Prime's Wage Deduction Policy provides that "post paid and prepaid sales are subject to a 180-day deactivation deduction as are feature commissions, both of which may be deducted from <u>my pay</u> when the Company is informed of same . . . ." (Acknowledgements 2011 (emphasis added).) Prime's November 2013 Employee Handbook informs employees that commissions are not earned until "180 days after customer activation" but that Prime will "advance payment on those commissions." (2013 Employee Handbook at 5.) However, there is no evidence that similar language was included in Prime's prior Employee Handbooks or the Acknowledgements signed by employees. Nor is there any other evidence that Prime characterized the commission payments as advances on unearned commissions prior to November 2013.

12

Prime having provided its employees with written notice in November 2013 that commissions were not earned until 180 days after customer activation, the parties do not dispute that the revised policy is effective as to commissions and bonuses paid to employees for sales occurring after November 2013. See Narron, 75 N.C. App. at 583, 331 S.E.2d at 207-08 (stating that employer may prospectively change employment benefits upon advance written notice to employees); N.C. Gen. Stat. § 95-25.13 (requiring written notice of employment policies and practices regarding promised wages). Accordingly, the court concludes that Prime is entitled to summary judgment as to any NCWHA claims arising from deductions made to commissions for sales after November 2013.

As to Plaintiffs' remaining wage deduction claims, however, there exist disputed factual issues that preclude summary judgment. The evidence presented by the parties is not such that it would lead a reasonable person to but one conclusion when asked whether Prime's chargebacks were made against earned commissions or were simply prepayments of commissions not yet earned. Thus, the court is unable to say, as a matter of law, whether Prime's adjustment or chargeback of commissions and bonuses for sales prior to November 2013 violated the NCWHA.

While Prime argues that the NCWHA does not provide a private remedy for violation of N.C. Gen. Stat. § 95-25.13, the court does not construe Plaintiffs' complaint as raising a separate, stand-

13

alone claim for violation of the notice provisions contained in § 95-25.13. Rather, Plaintiffs assert that Prime failed to pay commissions due in violation of N.C. Gen. Stat. § 95-25.6 and made improper wage deductions in violation of N.C. Gen. Stat. § 95-25.8. Evidence that Prime may have violated § 95-25.13 is relevant to these claims. Accordingly, summary judgment is granted in favor of Prime as to Plaintiffs' wage deduction claims arising after November 2013 and otherwise denied.

B.  Gross Profit Calculation

Plaintiffs further contend that Prime violated N.C. Gen. Stat. § 95-25.6 by excluding certain revenue from its gross profit calculation upon which commissions and bonuses were paid. As an authorized retailer for AT&T, Prime was paid a commission by AT&T for the sale of each newly activated Subscriber Agreement for wireless services. Prime included these payments from AT&T in calculating gross profits for purposes of determining the commissions and bonuses earned by Solution Specialists and Store Managers. As part of its dealer agreement with AT&T, Prime also received "residual" or "recurring" revenues from AT&T for the life of each Subscriber Agreement sold, which Prime did not include in calculating commissions and bonuses. Plaintiffs argue that these revenues, known as Subscriber Management Fees, were revenues attributable to point-of-sale transactions made by Prime employees and should have been included in gross profit. (Pls.' Mem. Supp.

14

Mot. Summ. J. at 8-9.) Prime contends these fees were not part of commissionable sales and were, therefore, properly excluded when calculating commissions and bonuses. (Def.'s Mem. Opp. Pls.' Mot. Summ. J. at 19-25.)

As to this claim, Prime is entitled to summary judgment. Evidence presented by Prime indicates that Subscriber Management Fees were paid to Prime for post-sale customer management services – to compensate Prime for servicing AT&T customers who later come to Prime's stores for service. (Whiddon Dep. [DE #313-10] at 40.) Although included in its "externally facing financials," such as financial statements provided for bank loan applications, this stream of income was not included in internal management reports, such as those tracking the profitability of Prime's respective stores. (Pls.' Stmt. Material Facts ¶ 46; Whiddon Dep. at 55-57.) There is no dispute that these revenues were not disclosed to or otherwise known by Prime's Solution Specialists and Store Managers. (Pls.' Stmt. Material Facts ¶ 44.) In fact, only five or six people in the company were aware of the Subscriber Management Fees paid to Prime. (Whiddon Dep. at 56, 68; Mohamed Dep. [DE #313-2] at 151.)

Plaintiffs' claim, although made pursuant to the NCWHA, is premised upon the parties' unilateral contract for the payment of commissions and bonuses under Prime's Sales Compensation Plan. "A unilateral contract is formed when one party makes a promise and

15

expressly or impliedly invites the other party to perform some act as a condition for making the promise binding on the promisor." Waters Edge Builders, LLC v. Longa, 214 N.C. App. 350, 356-57, 715 S.E.2d 193, 198 (2011) (quoting CIM Ins. Corp. v. Cascade Auto Glass, Inc., 190 N.C.App. 808, 811, 660 S.E.2d 907, 910 (2008)). Prime, as the master of its offer, was free to define the terms of its Sales Compensation Plan. See Narron, 75 N.C. App. at 582, 331 S.E.2d at 207 ("With the exception of statutory requirements to pay at least the current minimum wage and proper overtime . . . the employer is free to offer the employee any wage he desires. Moreover, with respect to wage-related benefits, . . . the employer can choose either to have no policy at all or to have any policy of his own choosing." (citations omitted)). And if a contract was formed, it must have been upon those terms offered since mutual assent is necessary to the formation of any contract, unilateral or otherwise.

There is no evidence suggesting that Prime ever intended Subscriber Management Fees to be part of the gross profit calculation referenced in its Sales Compensation Plan, and Plaintiffs do not argue otherwise. In fact, Plaintiffs assert that Prime "furtive[ly] excluded" these revenues, hiding even the existence of these revenues from its Solution Specialists and Store Managers. The undisputed evidence being that only five or six company officials were even aware of Subscriber Management Fees,

16

there can be no question that these fees did not form part of the parties' agreement. Moreover, depositions of the named plaintiff and other employees reveal that Prime's employees understood gross profit to be based upon the point-of-sale transactions less chargebacks. (See, e.g., Lorenzo Dep. [DE #307-3] at 80-81; Schweizer Dep. [DE #304-6] at 91-93; Klepac Dep. [DE #304-2] at 29.) Having considered all of the evidence presented, including the language of Prime's policies and the facts and circumstances of the parties' employment relationship, the court determines that no reasonable juror could find that Prime promised its employees that Subscriber Management Fees would be included in its calculation of commissions and bonuses. Accordingly, Prime is entitled to judgment as a matter of law as to this claim.

## CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment [DE #305] is GRANTED IN PART AND DENIED IN PART as more fully set forth above and Plaintiffs' Motion for Summary Judgment [DE #312] is DENIED.

This 29TH day of March 2018.

Malcolm J. Howard
Senior United States District Judge

At Greenville

17